AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)       ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**03/03/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**03/03/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ M.B. ___ DEPUTY

United States of America

v.

AHMED YEHIA KEICHOUR,

Defendant

Case No.   8:21-mj-00169-DUTY

UNDER SEAL

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 8, 2020 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Jeffrey Davis, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       3-3-2021

City and state:   Santa Ana, California

_____
*Judge's signature*

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: A. Gannon x3548

## AFFIDAVIT

I, Jeffrey Davis, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been
so employed since October 2004.  I completed the Criminal
Investigations Training Program at the Federal Law Enforcement
Training Center in Brunswick, Georgia.  I also completed the ATF
Special Agent Basic Training National Training Academy in
Brunswick, Georgia.  During those courses of study, I received
training in the investigation of federal firearm and explosive
violations.  Before becoming a Special Agent with the ATF, I was
employed as a Patrol Officer and an undercover Vice & Narcotics
Detective with the Howard County Police Department for
approximately four years.

2.   While employed as an ATF SA and as a Vice & Narcotics
detective, I have conducted investigations involving the
possession, use and sale of narcotics and firearms. I have also
participated in the undercover purchase of firearms, explosives,
and narcotics. To successfully conduct these investigations, I
have used a variety of investigative techniques and resources,
including physical surveillance, interviews, the utilization of
undercover agents and informants, and the review of various
databases and records.  Through these investigations, my
training and experience, and conversations with other
experienced agents and law enforcement personnel, I have become

familiar with the methods used by prohibited persons to possess, transfer, manufacture, and sell firearms and narcotics.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of criminal complaints against, and arrest warrants for, AHMED YEHIA KEICHOUR, FILIBERTO ESCALANTE, and EDUARDO DANIEL LOPEZ MORALES for violations of 21 U.S.C.§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute and Distribution of Methamphetamine), on or about the following dates: (1) as to defendant KEICHOUR, on or about December 8, 2020; (2) as to defendant ESCALANTE, on or about January 19, 2021; (3) as to defendant LOPEZ MORALES, on or about February 2, 2021.

4.    This affidavit is also made in support of search warrants for the following locations:

a.    The person of AHMED YEHIA KEICHOUR, SUBJECT PERSON 1 described in Attachment A-1;

b.    A white Toyota Prius bearing California license plate 8ELN477, registered to KEICHOUR, SUBJECT VEHICLE 1 described in Attachment A-2;

c.    The person of FILIBERTO ESCALANTE, SUBJECT PERSON 2 described in Attachment A-3;

d.    A white Lincoln MKS sedan bearing Arizona license plate CVJ9306, SUBJECT VEHICLE 2 described in Attached A-4;

e.    The person of EDUARDO DANIEL LOPEZ MORALES, SUBJECT PERSON 3 described in Attachment A-5; and

f.    A white Toyota Camry bearing California license plate 8KVL596, SUBJECT VEHICLE 3 described in Attached A-6

for the items to be seized described in Attachment B.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>PREMISES TO BE SEARCHED</u>

6.    The premises to be searched are the SUBJECT PERSONS described in Attachments A-1, A-3, and A-5 and the SUBJECT VEHICLES described in Attachments A-2, A-4, and A-6, which are incorporated herein by reference.

### IV. <u>ITEMS TO BE SEIZED</u>

7.    The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (drug trafficking conspiracy); 21 U.S.C. § 841(a)(1) (drug trafficking); 21 U.S.C. § 843(b) (unlawful use of communication facilities); 18 U.S.C. § 371 (conspiracy to engage in the business of dealing in firearms without a license); 18 U.S.C. § 924(c) (use and possession of a firearm during and in relation to narcotics trafficking); 18 U.S.C. § 922(a)(1)(A): (engaging in the business of dealing in firearms without a license); and 26 U.S.C. § 5861(d) (possession of an unregistered firearm);

(the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V. SUMMARY OF PROBABLE CAUSE

8.    Over a period of several months, KEICHOUR, ESCALANTE, and LOPEZ MORALES each sold more than 50 grams of pure methamphetamine and at least one firearm to individuals working with law enforcement.  The SUBJECT VEHICLES were used to transport the methamphetamine and firearms to these transactions.

## VI. STATEMENT OF PROBABLE CAUSE

9.    Beginning in January 2020, ATF, HSI, and Costa Mesa Police department initiated an investigation into cocaine, methamphetamine, and firearms trafficking in Orange County. This investigation has identified over 10 individuals and has resulted in the seizure of large quantities of controlled substances and numerous firearms.

10.    Beginning on January 24, 2020 and continuing to the present, a known broker of controlled substances and illegal firearms transactions ("the Broker") facilitated multiple sales of cocaine, methamphetamine, and firearms to two ATF

Confidential Informants (CI-1[1] and CI-2[2]) and a Costa Mesa Police Department undercover detective ("the UC").  The transactions detailed below were audio and video recorded.  I know the following based on my personal observations, conducting database queries, speaking with CI-1, CI-2, and the UC, and reviewing the recordings of the transactions.  In addition, I have reviewed recordings of phone calls and text messages between phone numbers preserved by software installed on CI-1 and CI-2's cellular phones.  Neither KEICHOUR, ESCALANTE nor the Broker who

---

[1] CI-1 involved in this investigation cooperates in exchange for monetary gain.  CI-1 has been paid as part of this investigation. CI-1 has provided truthful and credible information related to this investigation as well as previous and current ongoing investigations.  CI-1 was previously a member of a criminal street gang but informed me that he is no longer active or affiliated with the gang.  A criminal records check revealed the following information.  In 2011, CI-1 had a juvenile adjudication for first degree burglary and was sentenced to probation and 120 days in juvenile hall.  In 2013, CI-1 was arrested for participating in a criminal street gang, carrying a concealed weapon, and obstructing a public officer.  Criminal records state that prosecution was deferred in lieu of revocation of parole.  In 2017, CI-1 was arrested for possession of a controlled substance a criminal records check revealed that prosecution was declined due to an inadmissible search

[2] CI-2 involved in this investigation cooperates for monetary gain. CI-2 has been compensated related to this investigation in the form of U.S. Currency, lodging costs, and travel expenses. CI-2 has provided truthful and credible information related to this investigation. CI-2 has no known history of dishonesty other than his criminal history.  A criminal records check revealed a 1991 conviction for petty theft (3 days jail), bypass a meter to steal gas and enter a non-commercial building (3 days jail), taking a vehicle without owner's consent (30 days jail), grand theft (60 days jail), taking a vehicle and evading a peace officer (2 years prison), under the influence of a controlled substance (90 days jail), possession of a dangerous weapon and under the influence of a controlled substance (120 days jail), vehicle theft (3 years prison), domestic battery (10 days), assault with a deadly weapon (on a peace officer) (25 years – served 17 years).  CI-2 was previously associated with White Power groups but is no longer affiliated.

all engaged in multiple firearms transactions are federally registered firearms licensees.

November 12, 2020, Undercover Purchase of Firearms From KEICHOUR

11.  On November 12, 2020, CI-1, CI-2, and the UC met with the Broker at his residence in Costa Mesa for the purpose of purchasing firearms.  Approximately 30 minutes after CI-1, CI-2, and the UC arrived, the source of the firearms, later identified as KEICHOUR, arrived in SUBJECT VEHICLE 1.  Prior to exiting the apartment, the Broker changed the channel on the TV to display multiple security cameras on the outside of his residence. KEICHOUR was accompanied by a stocky Hispanic male who introduced himself as "Munchies."  "Munchies" placed a backpack on the couch and removed two firearms.  KEICHOUR instructed "Munchies" not to touch the firearms because he had already wiped them down.  CI-2 removed a short-barreled rifle which had been disassembled into a lower and upper receiver.  When asked by the UC, KEICHOUR affirmed that it was short-barreled.  When the UC had difficulty re-assembling the firearm, KEICHOUR took possession of the parts and quickly reassembled it and gave it to the UC.  CI-2 notified KEICHOUR and "Munchies" that he was a convicted felon and not capable of legally purchasing a firearm. KEICHOUR responded by stating that he was out on bail on local charges.  KEICHOUR and "Munchies" provided their phone numbers.

12.  CI-2 asked who he should pay and KEICHOUR said he would accept the payment.  CI-2 counted out $3,300 and KEICHOUR took possession of the money.  The backpack also contained a high capacity magazine and ammunition.  KEICHOUR and "Munchies"

departed and CI-2 paid the Broker $300 for arranging the transaction.

13.   The purchased firearms were a 1) a .223 caliber semi-automatic rifle (10" barrel) bearing no make, mode or serial number and 2) a MasterPiece Arms, model MPA30, 9mm caliber pistol, bearing number B8966.

14.   A records check revealed that KEICHOUR was the registered owner of SUBJECT VEHICLE 1.  The UC reviewed a known photograph of KEICHOUR and confirmed that he was the individual who he sold him the firearms.  KEICHOUR's face is clearly visible in the video recording of the transaction.

December 8, 2020 Arrest of KEICHOUR and Seizure of
Methamphetamine and a Firearm

15.   Between December 2 and 8, 2020, CI-2 and KEICHOUR exchanged multiple phone calls and text messages.  KEICHOUR said he was attempting to obtain 10 short-barreled rifles for CI-2 and expressed his ability to sell multiple pounds of methamphetamine.  CI-2 agreed to purchase all 10 short-barreled rifles and three pounds of methamphetamine.  They agreed to meet at the Broker's house on December 8.  KEICHOUR said the ten rifles would cost $1,000 each and the methamphetamine would be $1,700 per pound.

16.   On December 8, 2020, at approximately, 1:56 p.m., KEICHOUR said he was having trouble obtaining the 10 short-barreled rifles and suggested he had a handgun equipped with a laser and a high capacity magazine.  CI-2 called KEICHOUR and indicated he had $15,000 available and asked KEICHOUR how much

methamphetamine he could purchase in addition to the handgun.
KEICHOUR responded that he would sell six pounds and the firearm
for $11,600 and later suggested he would bring a "boat" of
Oxycodone for an undetermined price.  I know based on my
training and experience that a "boat" refers to 1,000 pills.
Later, KEICHOUR sent CI-2 a text message indicated that he would
also be bringing marijuana.

17.  A surveillance team was posted on KEICHOUR's residence
in Anaheim and observed him leaving in SUBJECT VEHICLE 1.  Prior
to arriving at the Broker's house in Costa Mesa, KEICHOUR was
stopped driving SUBJECT VEHICLE 1 by a marked CMPD patrol
vehicle for a violation of California Vehicle Code section
5201.1(B) – No Covering on License Plate.  I had previously
observed that SUBJECT VEHICLE 1 had a tinted license plate cover
that made the numbers and letters difficult to read.  A driver's
license query of KEICHOUR revealed he was also driving on a
suspended license.

18.  The officer who stopped KEICHOUR smelled the strong
odor of marijuana and KEICHOUR admitted he had marijuana in his
left front pocket.  KEICHOUR consented to a search of his person
and the officer found a small amount of suspected cocaine,
marijuana, and what appeared to be counterfeit Xanax pills.
KEICHOUR told the officer he had been blind folded and forced to
place a package inside SUBJECT VEHICLE 1 and deliver it to an
unknown subject.

19.  A trained K9 unit responded to the location and the K9
alerted to the presence of additional drugs in SUBJECT VEHICLE

1.  Following the K9 alert, a search of SUBJECT VEHICLE 1 revealed six pounds of suspected methamphetamine, the Glock type firearm with a laser and drum magazine, over 1,000 counterfeit pills, and a small amount of marijuana.  These items were located directly behind the driver's seat of SUBJECT VEHICLE 1. KEICHOUR was arrested and transported to CMPD for booking.

20.  At the CMPD Police Department, CMPD Sgt. Brown read KEICHOUR his Miranda rights from his department issued Miranda Warning Card.  KEICHOUR answered "Yes" to the four waiver questions and agreed to answer questions.  Based on KEICHOUR's answers to the initial questions, the officers and I knew he was not being truthful.  I, along with CMPD Ofc. Ranck, then spoke with KEICHOUR.  I explained that I would be sending the six pounds of methamphetamine to the DEA lab for analysis and the significant federal mandatory minimum sentences for drug trafficking.  KEICHOUR said he would talk to me but only if the recording devices were turned off.  At that point, Ofc. Ranck deactivated his CMPD body worn camera.

21.  KEICHOUR made the following statements:

a.  KEICHOUR's source often brings him between ten to thirty pounds of methamphetamine at a time and has provided between five to ten firearms at a time. Most of the firearms are "Ghost" Glock type pistols and AR-15 type firearms.

b.  During the past three months, KEICHOUR estimated that he has sold over 50 pounds of methamphetamine and 50 firearms.

     c.   KEICHOUR indicated that he was intending on selling the firearm and methamphetamine located in his vehicle.

     d.   After being notified that a search warrant was going to be served at his residence, KEICHOUR indicated that there would be three additional pounds of methamphetamine located in the closet.

     e.   KEICHOUR also stated that money and approximately ten ounces of cocaine would also be located inside a safe in his bedroom, which he shared with his girlfriend. KEICHOUR provided Ofc. Ranck with the combination to the safe.

     f.   KEICHOUR indicated that his girlfriend and younger brother would most likely be in the apartment.

22.  CMPD obtained a state search warrant for KEICHOUR's residence in Anaheim.  Just prior to the execution of the search warrant, law enforcement conducting surveillance observed KEICHOUR's girlfriend and younger brother leaving the residence. It was later learned that CMPD booking personnel had allowed KEICHOUR to call his girlfriend and KEICHOUR had warned her about the search warrant.

23.  KEICHOUR's girlfriend was found to be in possession of approximately 1.38 pounds of suspected cocaine, 22 grams of suspected Ecstasy/MDMA, what appeared to be counterfeit Oxy pills, 2.2 pounds of marijuana, and $20,812.

24.  An additional approximately three pounds of suspected methamphetamine was seized from the house.

25.   The suspected methamphetamine was sent to the DEA laboratory for analysis.  I received reports from the DEA laboratory with the following results:

a.   The suspected methamphetamine seized from SUBJECT VEHICLE 1 contained 2,554 grams of pure methamphetamine.

b.   The suspected methamphetamine seized from KEICHOUR's home contained 1,280 grams of pure methamphetamine.

January 19, 2021 Undercover Purchase of Methamphetamine and a Handgun from ESCALANTE

26.   Between December 14, 2020 and January 19, 2021, CI-2 and the Broker exchanged multiple phone calls and text messages. The Broker was using a new phone number after KEICHOUR's arrest. The Broker offered to supply additional firearms when CI-2 returned to Orange County during the week of January 19.

27.   On January 14, 2021, the Broker sent CI-2 a text stating, "22 for the mini ak 15 for ar taxed I think have another person getting back at me for 3 gloc n 3 oz Cristina". I understood this to mean that the Broker had an AK-47 type firearm available for $2200, a short barrel AR-15 type rifle available, and a separate source who was capable of selling three ounces of methamphetamine as well as three Glock type pistols.  The Broker sent photos including one that depicted what appeared to be 19 Glock type pistols and another that depicted an AR-15 type rifle.  During a January 18 phone call, the Broker indicated the supplier of the Glock type pistols was

"Angel."[3]  During the evening of January 18, CI-1 agreed to purchase one Glock and three ounces of methamphetamine.

28.  On January 19, 2021, at approximately 4:37 p.m., CI-1 and CI-2 arrived at the Broker's house.  At 5:03 p.m., ESCALANTE arrived at the Broker's residence and said someone would be arriving in a few minutes with the items.  ESCALANTE said he had been manufacturing Glock type pistols for two years.  ESCALANTE also discussed large amounts of methamphetamine stating that if CI-2 wanted to purchase 100 pounds of methamphetamine, it would require a 25% deposit.

29.  ESCALANTE said he deals drugs out of La Vida Cantina (located in Triangle Square in Costa Mesa).  At approximately 5:25 p.m., after briefly going outside, ESCALANTE returned with three baggies of suspected methamphetamine and said the firearm would be delivered shortly.  CI-2 paid ESCALANTE $860 for the methamphetamine.  A few minutes later, ESCALANTE left again and returned with a grey and black Glock type 9mm pistol.  CI-2 provided ESCALANTE $1,100 in exchange for the firearm.  CI-2 provided the Broker with $200 for arranging the deal.

30.  ESCALANTE's face is clearly visible in the video recording of the transaction.  ESCALANTE's identity was previously established through comparison to a known photo of him.

31.  The purchased firearm is a grey and black Glock type 9mm semi-automatic pistol, bearing no serial number.

---

[3] ESCALANTE identified himself as "Angel" when he met CI-2 at the Broker's house for a firearm transaction on November 17, 2020.

32.  The suspected methamphetamine was sent to the DEA laboratory for analysis.  I received a report from the DEA laboratory with the following result:

a.  The suspected methamphetamine contained 65.5 grams of pure methamphetamine.

February 2, 2021 Undercover Purchase of Methamphetamine from ESCALANTE

33.  On February 1, 2021, the UC texted with the Broker about future methamphetamine and firearms deals.  The Broker provided ESCALANTE's phone number.  Later that day, the UC made a recorded call to the Broker who said he was getting methamphetamine from ESCALANTE.  CI-2 and ESCALANTE also communicated directly about the sale of methamphetamine and firearms.  ESCALANTE indicated he paid $2,300 per pound of methamphetamine and would charge CI-2 $2,400.  CI-2 said he was out of town but would purchase one pound of methamphetamine and a firearm on February 2.

34.  On February 2, 2021, the UC told the Broker to meet him at the Ayres Hotel in Costa Mesa.  That afternoon, the Broker met with the UC in the parking lot of the Ayres Hotel. The UC paid the Broker $300.  A short time later, the UC texted ESCALANTE and let him know that the UC had checked into the Ayres hotel and provided him with the address.  At approximately 6:16 p.m., ESCALANTE arrived in the parking lot.  The UC and CI walked outside and met with ESCALANTE in the backseat of SUBJECT

VEHICLE 2.[4]  ESCALANTE was driving and there was an unidentified front passenger.  ESCALANTE gave the UC a plastic bag containing suspected methamphetamine and said the price was $2,200. ESCALANTE said the fully automatic AR was not ready.  The UC paid ESCALANTE $2,200.

35.  The suspected methamphetamine was sent to the DEA laboratory for analysis.  I received a report from the DEA laboratory with the following result:

a.  The suspected methamphetamine contained 426.5 grams of pure methamphetamine.

February 2, 2021 Undercover Purchase of Methamphetamine and a Shotgun from LOPEZ MORALES Brokered by KEICHOUR

36.  On January 26, 2021, the Broker told the UC that KEICHOUR was out on bail and looking to sell more firearms or methamphetamine.  The Broker provided the UC with KEICHOUR's new cell phone number.  Leading up to the February 2 transaction, the UC and KEICHOUR exchanged multiple phone calls and text messages.  KEICHOUR provided the UC with photographs of his bail receipt.  KEICHOUR indicated that because of his recent arrest, he was going to send a runner to deliver whatever the UC wanted to purchase.  The UC said he would purchase one short-barreled rifle and a pound of methamphetamine.  KEICHOUR later contacted the UC and said the runner would contact the UC to establish a location for the deal.

---

[4] SUBJECT VEHICLE 2 is not registered to ESCALANTE but he has been observed driving it on multiple occasions, including on January 26, 2021, when he drove the UC and CIs to a firearms transaction.

37.   On February 2, 2021, at approximately 5:52 p.m., the UC received a text message from someone identified as "Ahmed's homie."  The sender, later identified as LOPEZ MORALES, indicated he had his daughter with him and requested that the UC come to his location in Westminster.  Later that evening, the UC and the CI met with LOPEZ MORALES in the roundabout of an apartment complex in Westminster.  The UC and CI walked to the trunk of SUBJECT VEHICLE 3 and LOPEZ MORALES opened a box and showed the UC a shotgun.  The UC told LOPEZ MORALES he was looking to buy a short-barreled rifle.  LOPEZ MORALES said he had another firearm and removed a loaded Glock 19 from his waistband.  The UC said he only wanted to buy the shotgun.  The UC asked LOPEZ MORALES if he could get methamphetamine.  LOPEZ MORALES said everyone gets methamphetamine from him including KEICHOUR.  LOPEZ MORALES said he bailed KEICHOUR out when KEICHOUR was arrested.  The UC paid LOPEZ MORALES $2,700 for a pound of methamphetamine and the shotgun.

38.   The UC conducted a records check on SUBJECT VEHICLE 3 and learned it was not registered to LOPEZ MORALES, but that it had been towed in the city of Anaheim.  The UC called the tow company and learned LOPEZ MORALES picked up the vehicle.  The UC obtained a known photo of LOPEZ MORALES and confirmed he was the individual who sold the UC the shotgun and methamphetamine on February 2, 2021.  In addition, LOPEZ MORALES's face is clearly visible in the video recording.

39.   The purchased firearm is a Komando AV (Dickinson Arms), model XX3D Commando, 12 gauge shotgun, bearing serial number 2033122347.

40.   The suspected methamphetamine was sent to the DEA laboratory for analysis.  I received a report from the DEA laboratory with the following results:

a.   The suspected methamphetamine seized contained 452.2 grams of pure methamphetamine.

## VII.  TRAINING AND EXPERIENCE REGARDING DRUG AND FIREARMS TRAFFICKERS

41.   As set forth in detail above, I have had experience, and training in detecting and investigating drug and firearms trafficking.  I also have experience in debriefing informants as witnesses who have personal knowledge of drug and firearms trafficking organizations.  Such individuals often have knowledge regarding the methods of transportation and distribution of the drugs, firearms, and money in large-scale distribution operations.

42.   Based on my training experience and speaking to other agents and law enforcement personnel who are experts in the area, I also know the following:

a.   Drug and firearms traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of narcotics, firearms, money or other criminal proceeds are stored.  Therefore, drug and firearms traffickers often keep information about their

illegal activities in vehicles, on their person or stored on digital devices kept close to them.

b.   Drug and firearms traffickers often maintain in their vehicles, money, ledgers, narcotic and firearms supplier lists, correspondence, notations, logs, receipts, journals, books, records and other materials noting the price, quantity, or times when narcotics or firearms were obtained, transferred, sold, distributed, or concealed. Drug traffickers also maintain drug paraphernalia such as cutting materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics.

c.   Traffickers use cellular telephones and other digital devices to communicate with their suppliers and their customers.  As a result, traffickers often maintain in their vehicle and on their person records that reflect or contain names, nicknames, addresses, telephone numbers of other identifying information for their associates.

d.   Drug and firearms traffickers take or cause to be taken photographs and video recordings of themselves, their associates, their property and their product.

e.   Drug traffickers commonly have in their possession, that is on their persons or in their vehicles, firearms to protect and secure their property, including narcotics, narcotic paraphernalia, currency, jewelry, and documents.

f.   Drug and firearms traffickers often keep records of their illegal activities for a period of time extending

17

beyond the time during which they actually possess illegal controlled substances, to maintain contact with their criminal associates for future transactions, and to keep records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

43.  Based on the totality of circumstance, I believe that there is probable cause that the SUBJECT PERSONS and SUBJECT VEHICLES contain controlled substances, firearms, and various items used to facilitate the possession for purposes of distribution and distribution of controlled substances and firearms.

### VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

44.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress KEICHOUR, ESCALANTE and LOPEZ MORALES's
thumb and/or fingers on the device(s); and (2) hold the
device(s) in front of KEICHOUR, ESCALANTE and LOPEZ MORALES's

face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

47.  For all the reasons described above, there is probable cause to believe that AHMED YEHIA KEICHOUR, FILIBERTO ESCALANTE, and EDUARDO DANIEL LOPEZ MORALES violated 21 U.S.C.§ 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute and Distribution of Methamphetamine).

48.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT PERSONS and in the SUBJECT VEHICLES, as described in Attachment A-1 through A-6.


                                      */s/*

Jeffrey Davis, Special Agent
Bureau of Alcohol Tobacco,
Firearms and Explosives


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  3rd  day of
March, 2021.


HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

<u>PERSON TO BE SEARCHED</u>

The person of AHMED YEHIA KEICHOUR depicted in the photo below.



## ATTACHMENT A-2

<u>VEHICLE TO BE SEARCHED</u>

A white Toyota Prius bearing California license plate 8ELN477.

## **ATTACHMENT A-3**

<u>PERSON TO BE SEARCHED</u>

The person of FILIBERTO ESCALANTE depicted in the photo below.



## **ATTACHMENT A-4**

VEHICLE TO BE SEARCHED

A white Lincoln MKS sedan bearing Arizona license plate CVJ9306.

**<u>ATTACHMENT A-5</u>**

<u>PERSON TO BE SEARCHED</u>

The person of EDUARDO DANIEL LOPEZ MORALES depicted in the photo below.



**<u>ATTACHMENT A-6</u>**

<u>VEHICLE TO BE SEARCHED</u>

A white Toyota Camry bearing California license plate 8KVL596.

**ATTACHMENT B**

ITEMS TO BE SEIZED

The items to be seized are fruits, instrumentalities, and evidence of violations of 21 U.S.C. § 846 (drug trafficking conspiracy); 21 U.S.C. § 841(a)(1) (drug trafficking); 21 U.S.C. § 843(b) (unlawful use of communication facilities); 18 U.S.C. § 371 (conspiracy to engage in the business of dealing in firearms without a license); 18 U.S.C. § 924(c) (use and possession of a firearm during and in relation to narcotics trafficking); 18 U.S.C. § 922(a)(1)(A): (engaging in the business of dealing in firearms without a license); and 26 U.S.C. § 5861(d) (possession of an unregistered firearm) (collectively, the "Subject Offenses"), namely:

a.   Controlled substances, controlled substance derivatives, precursor chemicals, and other paraphernalia containing controlled substances;

b.   Controlled substance paraphernalia and equipment used for the distribution of controlled substances such as packaging materials and equipment, scales, labels, funnels, sifters, grinders, glass panes and mirrors, and razor blades;

c.   Material and equipment related to the cash proceeds of controlled substance and firearms trafficking including plastic packaging for cash, rubber bands, and money counting devices;

d.   Records and documents reflecting the names, nicknames, addresses, telephone numbers, and other contact or identification data for individuals involved in the illegal

manufacture, possession or distribution of controlled substances or firearms;

e.   Records and documents, programs related to additional storage locations for controlled substances or firearms;

f.   United States or foreign currency with a total value in excess of $500 USD;

g.   Records, documents, receipts, notes, ledgers, tally sheets, and other items relating to the illegal manufacture, possession or distribution of controlled substances or firearms;

h.   Records, documents, receipts, notes, ledgers, tally sheets, and other items relating to proceeds or assets obtained as a result of the illegal manufacture, possession or distribution of controlled substances or firearms;

i.   Photographs and video recordings depicting controlled substances or firearms or any entities or individuals involved in the illegal manufacture, possession or distribution of controlled substances or firearms;

j.   No more than 5 documents and records reflecting the ownership, occupancy, possession, or control of the Subject Location, including registration documents and addressed envelopes;

k.   Any firearm, as defined at 18 U.S.C. § 922(a)(3), firearm parts, ammunition, firearm cases, receipts for purchase, sale or transfer of firearms, and any tools or machines related to the manufacturing of firearms;

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

             viii.    records of or information about
Internet Protocol addresses used by the device;

             ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

### IX.  SEARCH PROCEDURE FOR DIGITAL DEVICES

In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

           ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

           iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

        g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

During the execution of this search warrant, law enforcement is permitted to: (1) depress KEICHOUR, ESCALANTE and LOPEZ MORALES's  thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of KEICHOUR, ESCALANTE and LOPEZ MORALES's face with his or her eyes open to

activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.